Exhibit Z

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


-------------------------------------

BARRY ROSEN,                            )

                       Plaintiff,       )

                                        )

            vs.                         ) NO. CV12-10413

                                        )     ABC (Ex)

                                        )

AMAZON.COM, INC., and DOES 1 TO         )

10,                                     )

                       Defendants.      )

-------------------------------------


VOLUME II


VIDEOTAPED DEPOSITION OF BARRY ROSEN,

at the Law Offices of Davis Wright Tremaine LLP,

865 S. Figueroa Street, Suite 2400, Los Angeles,

California, commencing at 1:58 p.m., Wednesday,

January 22, 2014, before Donna E. Boulger, RPR,

CSR No. 6162.


PAGES 22 - 150

**Barry Rosen – 1/22/2014**

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4

 5            WOOLF GAFNI & FOWLER LLP

 6            BY:  ADAM I. GAFNI, ESQ.

 7            10850 Wilshire Boulevard, Suite 510

 8            Los Angeles, California  90024

 9            (310) 474-8776

10

11

12    FOR THE DEFENDANT:

13

14            DAVIS WRIGHT TREMAINE LLP

15            BY:  SEAN M. SULLIVAN, ESQ.

16            865 S. Figueroa Street, Suite 2400

17            Los Angeles, California  90017-2566

18            (213) 633-6800

19

20    Also Present:

21            Sergio Esparza, Videographer

22

23

24

25
```

**Barry Rosen - 1/22/2014**

```
 1      Los Angeles, California - Wednesday, January 22, 2014
 2                          *   *   *
 3
 4          THE VIDEOGRAPHER:  Good afternoon.  We are on
 5   the record at 1:58 p.m. on January 22nd, 2014, for the      01:58
 6   videotaped deposition of Mr. Barry Rosen.
 7          We are taping this proceeding -- excuse me,
 8   this deposition at 865 South Figueroa Street,
 9   Suite 2400, in Los Angeles, California, in the action
10   entitled Barry Rosen versus Amazon.com, Inc., Case         01:59
11   Number CV12-10413 ABC.
12          My name is Sergio Esparza.  I am the video
13   production specialist from Ben Hyatt Certified
14   Deposition Reporters, located in Tarzana, California.
15          This is tape 1 of Volume I [sic].  Excuse me.       01:59
16   Would counsel and all present please identify yourselves
17   for the record.
18          MR. GAFNI:  Adam Gafni, G-a-f-n-i, counsel for
19   plaintiff, Barry Rosen.
20          MR. SULLIVAN:  Sean Sullivan, S-e-a-n,              01:59
21   S-u-l-l-i-v-a-n, for defendant Amazon.com, Incorporated.
22   ///
23   ///
24   ///
25                                                              01:59
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Barry Rosen - 1/22/2014**

```
1                    BARRY ROSEN,                    01:59
2    called as a witness, having been first duly sworn, was
3    examined and testified as follows:
4
5                    EXAMINATION                      01:59
6    BY MR. SULLIVAN:
7       Q    Mr. Rosen, we previously have taken a short bit
8    of your deposition.  I just want to remind you that, as
9    before, you're testifying under oath.
10           Do you understand that you're under oath and   02:00
11   testifying under penalty of perjury?
12      A    Yes.
13      Q    Okay.  Last time we were here, you were
14   suffering from flu-like symptoms.  Are you suffering
15   from anything like the flu today, or anything like that?  02:00
16      A    Yeah.  Having a pretty bad day, actually.
17      Q    Okay.  Are you on any sort of medication?
18      A    Yes, I am.
19      Q    And does that medication affect your memory?
20      A    It could.                                       02:00
21      Q    What type of medication are you on?
22      A    Oxycodone.
23      Q    Well, if -- do you believe that the medication
24   that you're on today will affect your testimony in any
25   way today?                                              02:00
```

Page 25

**Barry Rosen - 1/22/2014**

```
1        A    I can't be certain.                              02:00
2        Q    Well, is there any reason you can think of why
3    you will not be able to answer my questions fully and
4    truthfully today?
5             MR. GAFNI:  Objection.  Vague and ambiguous.     02:01
6    Lacks foundation.
7    BY MR. SULLIVAN:
8        Q    If you understand the question, you can answer.
9        A    I can't be certain.
10       Q    Well, if there's ever a time that you believe   02:01
11   that any of my questions are unclear or that you need
12   further explanation, please let me know that.
13            Do you understand that?
14       A    Yep.
15       Q    Okay.  And I will do my best to ask clear       02:01
16   questions for you, explain to the extent possible.
17            And again, to the extent that you're having any
18   issues resulting from the medication that you're on,
19   please let me know and we'll address that as -- as it
20   comes up.  Okay?                                          02:01
21       A    Uh-huh.
22       Q    And for the court reporter's benefit, if you
23   could answer with "yes," "no," or complete answers,
24   rather than "uh-huh" or head nods, that sort of thing.
25       A    Sorry.  I'm just -- I'm having problems.  My     02:02
```

Page 26

**Barry Rosen – 1/22/2014**

1    ear's blocked up on me and it's just -- it's like

2    somebody hit me upside the head with a sledgehammer

3    right now.

4        Q    Do you believe you're going to be able to

5    participate in the deposition right now or do you need

6    to take care of that first?

7        A    I don't know what to do about it.  It's just

8    killing me.  It's come -- coming up the elevator, the

9    pressure.  My ear's not equalizing and it's just -- I've

10   never had it happen.  It's really painful.

11       Q    Would you like to take a break, or is there

12   something we can do, or would you like to proceed,

13   Mr. Rosen?

14       A    Actually, well -- I'm just trying to think

15   here.

16            I mean, I just don't know how I could get it to

17   equalize.

18       Q    Do you think you're going to be able to answer

19   questions as we sit here right now or is this going to

20   affect your ability to answer questions?

21       A    It's definitely going to affect my ability to

22   answer questions.  It's like somebody just -- it's like

23   the side of my face wants to explode right now.

24            MR. SULLIVAN:  Counsel, do you -- how do you

25   want to proceed, in light of this?

02:02

02:02

02:02

02:02

02:03

02:03

Page 27

Barry Rosen - 1/22/2014

```
 1       A    I can't explain it.                          02:29

 2       Q    Okay.  Well, we'll -- we'll move on.  I'm just

 3   trying to get a sense for the types of photographs that

 4   you take on a day-in, day-out basis.

 5            So let's say, in your normal day, when you're   02:30

 6   practicing the professions of a photographer, what do

 7   you do?  What does your typical day look like?

 8       A    Couldn't say.  I don't think there is such a

 9   thing.

10       Q    Okay.  Well, can you give me an example of a    02:30

11   day where you've taken photographs as part of your

12   profession?

13       A    Not right off the top of my head, no.

14       Q    Okay.  Did you take any photographs yesterday

15   as part of your profession as a photographer?           02:30

16       A    No.

17       Q    Okay.  Anytime in the past week?

18       A    I'm trying to think.  I can't think right now.

19       Q    Even in a month.

20       A    Maybe.  I just can't think of anything at the   02:31

21   moment.

22       Q    Okay.  All right.  Well, let's move on.

23            If you do think of any instances, let me know.

24   We can always come back to that.

25            MR. GAFNI:  The question was instances of?      02:31
```

**Barry Rosen - 1/22/2014**

```
 1            MR. SULLIVAN:  When he has taken photographs --        02:31
 2     actually, we can just read it back.
 3            Can you read back the question that was
 4     pending.
 5            MR. GAFNI:  It was the act of taking              02:31
 6     photographs as a professional photographer in the last
 7     month?
 8     BY MR. SULLIVAN:
 9        Q    It was:  Can you give me an example of a day
10     where you've taken photographs as part of your           02:31
11     profession?
12            And then I asked, in the past week or past
13     month.
14            All right.  We'll come back to that.
15            So let's move on to some specifics, then.         02:32
16     We'll -- we'll just focus on -- I'm going to introduce
17     now a document that is titled "Certificate of
18     Registration," and is Bates stamped at the bottom
19     Rosen-000001 through 000003 to be marked as Exhibit 1.
20            (Exhibit 1 was marked for identification          02:32
21            and is annexed hereto.)
22     BY MR. SULLIVAN:
23        Q    Mr. Rosen, can you take a look at that
24     document.  Let me know when you're ready.
25        A    Oops.  Forgot my glasses today.                  02:33
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1          Okay.                                                    02:33

2     Q     Do you recognize this document?

3     A     Looks like my copyright registration.  I can't

4  be sure because I didn't print this out.

5     Q     Do you know who printed that out?                       02:33

6     A     I have no idea who printed it out.

7     Q     This was a document produced by your counsel to

8  me, to us, in this litigation.  And it's marked at the

9  bottom with your Bates stamps.  So is it safe to assume

10 that your counsel printed that out?                             02:34

11    A     I would have no way to know.

12    Q     Okay.  Well, can you identify, in your own

13 words, the image that is attached to this, which is on

14 the third page of the document?  It's Rosen-00003.

15    A     What about it?                                          02:34

16    Q     Who is that a photograph of?

17    A     Erika Eleniak.

18    Q     Okay.  And when did you take that photograph?

19    A     I don't recall.

20    Q     Was it in the past 10 years, 20 years?                  02:34

21    A     I'd say it was in the past 20 years.

22    Q     And do you -- did -- did you fill this document

23 out?  Did you complete this document when filing it?

24    A     I believe I did so.

25    Q     Okay.  Do you typically fill out your own            02:35

**Barry Rosen - 1/22/2014**

```
 1   applications for copyright registrations?                    02:35

 2       A   Yes.

 3       Q   Okay.  And do you have copies of the actual

 4   applications that you filed?

 5       A   Sorry.  I don't understand the question.            02:35

 6       Q   The application for copyright registration, do

 7   you have an actual copy of the document, the application

 8   that you completed?

 9           MR. GAFNI:  Objection.  Vague and ambiguous.

10           Do you mean for this document?                      02:35

11           MR. SULLIVAN:  Let me clarify.  Let me strike

12   that.  We'll go back.

13   BY MR. SULLIVAN:

14       Q   For this specific registration, for the

15   document that's marked as Exhibit 1, do you have a copy    02:36

16   of the application that you filed to get this copyright

17   registration?

18       A   No.

19       Q   Okay.  Do you typically keep any applications

20   that you file for copyright registrations?                 02:36

21       A   No.

22       Q   Do you typically file your own applications?

23       A   Yes.

24       Q   And how do you do that?

25       A   I'm sorry.  I kind of --                           02:36
```

Page 36

**Barry Rosen - 1/22/2014**

1      Q     Online?

2            Sorry.  Do you file them online?  Do you mail

3   them in?

4      A     Depends on the application.

5      Q     So for this application, do you recall whether

6   you mailed it in, filled it out online?

7      A     It was probably mailed in.

8      Q     Okay.  Do you recall what you submitted, what

9   type of deposit material -- well, let me back up.

10  Sorry.  Strike that.

11           Do you understand what I'm referring to when

12  I -- when I reference "deposit material"?

13     A     I think so.

14     Q     What does "deposit material" mean to you?

15     A     I think you're referring to what accompanied

16  the application for the copyright registration.

17     Q     That's right.  That's right.  That is what I'm

18  referring to.

19           Do you -- do you recall what you submitted in

20  terms of deposit material with the application for the

21  copyright registration that is Exhibit 1?

22     A     Not at this moment.

23     Q     Was the image that's attached here, which is

24  the third page of Exhibit 1, was that something you

25  submitted, Mr. Rosen, along with the application for the

Page 37

02:36

02:36

02:36

02:37

02:37

02:37

**Barry Rosen - 1/22/2014**

1    copyright registration that is Exhibit 1?                    02:37

2         MR. GAFNI:  Objection.  Vague and ambiguous as

3    to "the image."

4         THE WITNESS:  I don't understand the question.

5    BY MR. SULLIVAN:                                             02:38

6    Q    Sure.

7         Take a look at the third page of what is

8    Exhibit 1.

9    A    (Witness complies.)

10   Q    Do you recall whether or not you submitted this    02:38

11   image along with your application for the registration

12   that is Exhibit 1?

13        MR. GAFNI:  Vague and ambiguous.

14        You mean this image as it exactly appears on

15   Exhibit -- the third page?                                  02:38

16   BY MR. SULLIVAN:

17   Q    Do you understand my question?

18   A    No.  I don't understand your question.

19   Q    Okay.  Well, do you recall whether you

20   submitted this image exactly as it appears on this page    02:38

21   when you submitted your application for copyright

22   registration that is Exhibit 1?

23   A    Sorry.  I didn't quite get that.  Can you

24   repeat that?

25        MR. SULLIVAN:  Can you repeat the question.          02:38

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1           (Whereupon, the record was read by the

2           reporter as follows:                           02:39

3           "Q   Okay.  Well, do you recall

4           whether you submitted this image

5           exactly as it appears on this page            02:39

6           when you submitted your application

7           for copyright registration that is

8           Exhibit 1?")

9           THE WITNESS:  Exactly as it -- I'm sorry.  That

10   makes no sense it me, how you're asking your question.   02:39

11   BY MR. SULLIVAN:

12       Q   Okay.  Let me try to clarify it for you.

13           When you submitted the deposit material for

14   this application that led to the registration, did you

15   submit a slide or was it an actual printed-out page?    02:39

16   What form did it take?

17       A   This second, I cannot recall.

18       Q   What do you typically submit with your

19   applications when you're seeking copyright registration

20   for one of your photographic images?                    02:39

21       A   Depends on situations.

22       Q   What are some examples of the form of the

23   images you might send in?

24           Do you send in slides?

25       A   I have.                                          02:40

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen – 1/22/2014**

1    Q    Do you send in digital images ever?                    02:40

2    A    I have.

3    Q    Any other forms you might have sent in?

4    A    I can't think of it at the moment.  Sorry.

5    Q    How about a print on a page?                           02:40

6    A    What do you mean by "print on a page"?

7    Q    For example, just a printed image, one of your

8    digital images or one of your other images just printed,

9    whether it be on actual photographic print paper or on

10   just a sheet of paper.                                      02:41

11   A    I can't recall right this second.

12   Q    Okay.  And do you recall whether, when you

13   submitted this image to the copyright office, that is on

14   the third page of Exhibit 1, you included the

15   information here, the copyright designation that's         02:41

16   printed here, "Copyright Barry Rosen – All Rights

17   Reserved"?

18   A    I can't recall at this moment.

19   Q    Do you typically include that language on

20   your -- on the images that you submit to the copyright    02:41

21   office with your copyright applications?

22   A    I couldn't say right this second.

23   Q    Have you ever included that language in any --

24   on any image that you've submitted to the copyright

25   office with any applications?                              02:41

Page 40

**Barry Rosen - 1/22/2014**

1    A    I couldn't tell you at this moment.

2    Q    So you don't recall ever doing it?

3    A    At right this second in time, I can't recall.

4    Q    Well, do you know how that language got on that

5    image, then, Mr. Rosen?

6    A    I might have put it there.

7    Q    Would you have put it there after you received

8    the registration?

9    A    I don't recall.

10    Q    So with this copyright application that you

11    submitted for the image of Erika Eleniak, do you know

12    how you answered the question whether the work was

13    published?

14    A    Work is unpublished, to the best of my

15    knowledge.

16    Q    How did you indicate who was the author?

17    A    Well, it's right on the page.

18    Q    And what does it say?

19    A    It says my name.

20    Q    Okay.  And you're the owner of the work also;

21    is that right, Mr. Rosen?

22    A    Yes, I am.

23    Q    Do you recall why you took this photograph?

24         MR. GAFNI:  Objection.  Vague and ambiguous.

25         THE WITNESS:  No, not at this moment.

02:41
02:42
02:42
02:43
02:43
02:43

Page 41

**Barry Rosen - 1/22/2014**

1    BY MR. SULLIVAN:                                          02:43

2       Q    Do you recall when you took the photograph that

3    is the -- represented on the third page of this

4    copyright registration, do you recall whether you did

5    that pursuant to a contract or an agreement of some      02:43

6    sort?

7       A    It would not have been done under an agreement.

8       Q    How do you know that?

9       A    This is a generality.  Most of my shoots are

10   created by me.                                           02:44

11      Q    What do you mean --

12      A    At my own initiative.

13      Q    I'm sorry.  Did you say on your own initiative?

14      A    (Witness nods head up and down.)

15      Q    And what do you mean by that?                     02:44

16      A    It means that I take steps to do the shoot on

17   my own initiative.

18      Q    So does that mean that you reach out to the

19   models yourself?

20      A    Could be.                                         02:45

21      Q    Well, what does it mean to you?

22           I'm just trying to figure out what you are

23   saying when you say you create the photo shoots through

24   your own initiative.

25           Does that mean the entirety of the photo shoot,  02:45

Page 42

**Barry Rosen - 1/22/2014**

1   including getting the models?                                    02:45

2       A    Could be.

3       Q    In this instance, do you recall whether or not

4   you reached out to the model to participate in the photo

5   shoot that led to the photograph that is on the third          02:45

6   page of Exhibit 1?

7       A    At this moment, I don't recall specifics, no.

8   I don't recall at all.

9       Q    So when -- when a model like Erika Eleniak

10  agrees to have her photo taken, would she -- sorry.            02:45

11  Strike that.

12           So when Erika Eleniak participated in this

13  photo shoot, you don't recall whether she agreed to any

14  sort of contract or agreement with you?

15      A    At this moment in time, no.                           02:46

16      Q    What did you intend to do with this photograph

17  of Erika Eleniak?

18           MR. GAFNI:  Vague and ambiguous as to time, "do

19  with."

20           THE WITNESS:  Ow.  Sorry.  I don't understand        02:46

21  the question.

22  BY MR. SULLIVAN:

23      Q    Okay.  Did you -- were you planning to sell

24  this image?

25      A    Sorry.  "Sell"?                                      02:46

Page 43

**Barry Rosen - 1/22/2014**

| | | |
|---|---|---|
| 1 | Q   Yes.  Like, sell it to somebody?  Sell the | 02:46 |
| 2 | rights to it to somebody? | |
| 3 | A   No, not sell the rights. | |
| 4 | Q   License it? | |
| 5 | A   License?  Yes. | 02:47 |
| 6 | Q   To whom would you license this image? | |
| 7 | A   Generally, editorial. | |
| 8 | Q   What do you mean by "editorial"? | |
| 9 | A   Magazines, newspapers. | |
| 10 | Q   Any particular type of magazines or newspapers? | 02:47 |
| 11 | A   No. | |
| 12 | Q   So any magazine or newspaper? | |
| 13 | A   Depends on situations. | |
| 14 | Q   So for a photograph like the one here that's in | |
| 15 | Exhibit 1, of Erika Eleniak, what type of magazine or | 02:47 |
| 16 | newspaper would you license this image to? | |
| 17 | A   Could be any number of magazines or newspapers, | |
| 18 | et cetera. | |
| 19 | Q   Can you give me some examples? | |
| 20 | A   Not that I can think of at this moment. | 02:48 |
| 21 | Q   So you can't think of any magazines or | |
| 22 | newspapers that you would license this image to? | |
| 23 | MR. GAFNI:  Objection.  Vague and ambiguous. | |
| 24 | Incomplete hypothetical. | |
| 25 | THE WITNESS:  Not at this moment. | 02:48 |

Page 44

**Barry Rosen – 1/22/2014**

1    BY MR. SULLIVAN:                                                    02:48

2        Q    Do you recall whether, for this photograph that

3    is on the third page of Exhibit 1, you were asked to

4    take the photograph by any company, whether it be a

5    magazine, a newspaper, any other type of company?        02:48

6        A    Not at this moment.

7        Q    Would you have any records that would reflect

8    whether or not you were asked to take the photograph

9    that's on page 3 of Exhibit 1?

10       A    No, I would not.                                 02:49

11       Q    Have you ever agreed, in -- whether it be a

12   contract or some sort of agreement, to take photographs

13   for a newspaper?

14       A    I don't believe so.

15       Q    Have you ever agreed, again, whether it be in    02:49

16   contract or some sort of agreement, to take photographs

17   for a magazine?

18       A    I don't believe so.

19       Q    Same question, but have you agreed, whether it

20   be pursuant to a contract or some other sort of          02:50

21   agreement, to take photographs for a model?

22            MR. GAFNI:  Objection.  Extremely vague

23   question.

24            THE WITNESS:  I don't understand the question.

25   ///

**Barry Rosen - 1/22/2014**

1    BY MR. SULLIVAN:                                                    02:50

2        Q    Okay.  So, for instance, here, you don't recall

3    whether Ms. Eleniak asked you to take the photograph for

4    her; is that correct?

5        A    I don't do photographs for models.                        02:50

6        Q    So in this instance, for Ms. Eleniak, this

7    would have been something you arranged yourself?

8        A    I can't recall at this moment.

9        Q    But you're certain that you did not take the

10   photograph at Ms. Eleniak's request?                               02:50

11       A    I think so.

12       Q    Do you know whether you were paid to take this

13   photograph of Ms. Eleniak that's on the third page of

14   Exhibit 1?

15       A    I don't believe I was.                                    02:51

16       Q    I'm going to introduce two other documents.

17   One, Exhibit 2 -- ask the court reporter to mark as

18   Exhibit 2 a document in Bates ranges, on the bottom,

19   Rosen-000022 through -24, which is, on its face, listed

20   as a Registration Number VAu 1-027-889, for the title of  02:52

21   work:  Charlotte Lewis.

22            (Exhibit 2 was marked for identification

23            and is annexed hereto.)

24            MR. SULLIVAN:  And then as Exhibit 3, a

25   document with the Bates numbers Rosen-000037 through       02:52

Page 46

Barry Rosen - 1/22/2014

```
1    -39, again, at the top, listed as Certificate of          02:52
2    Registration, with the Registration Number VAu 660-263,
3    with the title of the work listed as Ali Landry.
4              (Exhibit 3 was marked for identification
5              and is annexed hereto.)                          02:53
6         MR. SULLIVAN:  Ask those be marked and handed
7    to the witness.
8    BY MR. SULLIVAN:
9         Q    Mr. Rosen, if you could take a look at the
10   documents that have been marked as Exhibit 2 and Exhibit   02:53
11   3.  And let me know when you're ready.
12        A    I need to take a break for one second.
13             MR. SULLIVAN:  Sure.  We'll take a break.
14             THE VIDEOGRAPHER:  Off the record.  The time is
15   2:54 p.m.                                                  02:54
16             (Recess taken.)
17             THE VIDEOGRAPHER:  On the record.  The time is
18   2:55 p.m.
19             MR. GAFNI:  I just wanted the video record and
20   the court record to reflect that Mr. Rosen is chewing      02:55
21   gum due to an ear issue and solely for that reason.
22   Okay.
23   BY MR. SULLIVAN:
24        Q    Mr. Rosen, if you -- again, you have Exhibit 2
25   and Exhibit 3 in front of you.  If you could take a look   02:56
```

Page 47

**Barry Rosen - 1/22/2014**

1   at those and then let me know when you're ready.  I have          02:56

2   a few questions for you about them.

3       A    Okay.  Ready.

4       Q    Okay.  For Exhibit 2, do you have any specific

5   recollection of taking that photograph?                           02:56

6       A    Not at this time.

7       Q    Did you take that photograph?

8       A    Are you referring to on page -- must be page 3?

9       Q    That's correct, Mr. Rosen.

10           Did you take the photograph that is on page 3            02:57

11   of Exhibit 2?

12       A    Yes, I did.

13       Q    Do you recall when you took that photograph,

14   Mr. Rosen?

15       A    Not specifically.                                       02:57

16       Q    If you look at the first page of Exhibit 2, I

17   believe it says here, under the title,

18   "Completion/Publication, Year of Completion:  1996."

19           Does that refresh your recollection as to when

20   you took this photograph that is on page 3 of Exhibit 2?         02:57

21       A    Little bit.

22       Q    Do you have any reason to believe that's

23   inaccurate?

24       A    I don't think so, but I couldn't tell you

25   specifically.  At this time, anyway.                             02:57

Page 48

**Barry Rosen - 1/22/2014**

1      Q    But you do recall taking this photograph that's                02:58

2   on page 3 of Exhibit 2, Mr. Rosen?

3      A    Yes, I do.

4      Q    Okay.  Do you recall why you took the

5   photograph that's on page 3 of Exhibit 2?                              02:58

6      A    Not at this time.

7      Q    Was this -- was the photograph that's on page 3

8   of Exhibit 2 taken at the request of someone?

9      A    I don't believe that it was.

10     Q    And the subject of this photograph is Charlotte               02:58

11  Lewis; is that correct?

12     A    I believe it is.

13     Q    Did Ms. Lewis ask you to take the photograph

14  that's on page 3 of Exhibit 2?

15          MR. GAFNI:  Objection.  Vague and ambiguous as                 02:58

16  to "ask."

17  BY MR. SULLIVAN:

18     Q    Do you understand the question?

19     A    Yes.  And likely not.

20     Q    And why not, Mr. Rosen?                                        02:59

21          MR. GAFNI:  Objection.  Calls for speculation.

22          THE WITNESS:  I couldn't tell you at this time.

23  BY MR. SULLIVAN:

24     Q    But you don't believe that Ms. Lewis requested

25  that you take this photograph that's on page 3 of                      02:59

Page 49

**Barry Rosen - 1/22/2014**

| | | |
|---|---|---|
| 1 | Exhibit 2? | 02:59 |
| 2 | MR. GAFNI:  Objection.  Vague as to | |
| 3 | "requested." | |
| 4 | THE WITNESS:  I don't believe so. | |
| 5 | BY MR. SULLIVAN: | 02:59 |
| 6 | Q    Again, why is that? | |
| 7 | MR. GAFNI:  Objection.  Calls for speculation. | |
| 8 | Vague and ambiguous. | |
| 9 | THE WITNESS:  I couldn't tell you at this time. | |
| 10 | BY MR. SULLIVAN: | 02:59 |
| 11 | Q    You just don't believe that she would have | |
| 12 | asked you to take this picture; is that correct? | |
| 13 | A    I would think so, but I just couldn't tell you | |
| 14 | at this time. | |
| 15 | Q    Again, as with Exhibit 1, on the third page of | 03:00 |
| 16 | Exhibit 2, you'll see it has this language, the | |
| 17 | copyright symbol, and then "Barry Rosen - All Rights | |
| 18 | Reserved." | |
| 19 | Did you put that language on this photograph | |
| 20 | that's on page 3 of Exhibit 2? | 03:00 |
| 21 | A    I would think so. | |
| 22 | Q    But you don't recall doing it specifically? | |
| 23 | A    Not at this time. | |
| 24 | Q    Do you recall when you might have put that | |
| 25 | language on the image that is on page 3 of Exhibit 2? | 03:00 |

Page 50

Barry Rosen – 1/22/2014

```
 1      A    Not at this time.                              03:00

 2      Q    Did you put that language on the image that's

 3 on page 3 of Exhibit 2 before you sent it to the

 4 copyright office?

 5      A    I couldn't tell you at this time.              03:01

 6      Q    Do you have any records that might refresh your

 7 recollection as to whether or not you put that language

 8 on this image before you sent it to the copyright

 9 office?

10      A    I can't think of anything right at this second. 03:01

11      Q    Again, you -- do you have any copies of any of

12 the applications for -- I'm sorry.  Strike that that.

13           Do you have a copy of the application for this

14 copyright registration?

15      A    I would think not.                             03:01

16      Q    But you're not sure?

17      A    I wouldn't think I have any copies of the

18 applications.

19      Q    Why wouldn't you think that you have any copies

20 of any of the applications?                              03:01

21      A    Because I likely wouldn't have kept them.

22      Q    Why wouldn't you have kept them?

23      A    I would think there would be no reason to.

24      Q    So is -- do you typically throw away the

25 applications after you file them?                        03:02
```

Page 51

**Barry Rosen – 1/22/2014**

1       A     Not certain.                                    03:02

2       Q     Do you have any files where you might keep

3   applications that you could look through to become

4   certain?

5       A     Nope.                                           03:03

6       Q     Do you have any files that might contain any of

7   the applications for any of your copyright

8   registrations?

9       A     Nope.

10      Q     Does anyone else have any files that might      03:03

11  contain the applications for your copyright

12  registrations?

13      A     I don't believe so.

14      Q     Do you recall, for the image that is on page 3

15  of Exhibit 2, whether you submitted this to the         03:03

16  copyright office as a slide, as a digital image, how you

17  might have submitted this image?

18      A     I don't recall at this time.

19      Q     Oh, a question for Exhibit 2:  Do you know

20  whether you provided a copy of the image that is on page 03:04

21  3 of Exhibit 2 to the model?

22      A     I can't recall at this time.

23      Q     Do you typically provide copies of the images

24  you take to the models?

25      A     I would say probably not.                       03:04

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1    Q    So help me understand just a -- if you could,    03:04

2  why would these models agree to have their photographs

3  taken by you if they're not entering into an agreement

4  with you and you're not providing them with copies?

5         MR. GAFNI:  Objection.  Calls for speculation.    03:05

6         You can answer if you have some understanding.

7         THE WITNESS:  Depend on situations.

8  BY MR. SULLIVAN:

9    Q    So why would Charlotte Lewis agree to have her

10 photograph taken by you in 1996, or thereabout?    03:05

11   A    I don't recall the circumstances at this time.

12   Q    Certainly she's not doing it just to have her

13 photograph taken?

14        MR. GAFNI:  Objection.  Speculation.

15        THE WITNESS:  I couldn't speculate on that.    03:05

16 BY MR. SULLIVAN:

17   Q    Okay.  Were you paid to take the photograph,

18 the image that is on page 3 of Exhibit 2?

19   A    Say, probably not.

20   Q    Did you ever license the image that is on page    03:06

21 3 of Exhibit 2?

22   A    I don't believe I did.

23   Q    Did you ever publish the image that's on page 3

24 of Exhibit 2?

25   A    I don't believe I did.    03:06

Page 53

**Barry Rosen – 1/22/2014**

```
 1      Q    Do you know whether anyone else ever published   03:06
 2   the image that's on page 3 of Exhibit 2?
 3           MR. GAFNI:  Objection.  Vague and ambiguous as
 4   to "publish."
 5   BY MR. SULLIVAN:                                          03:06
 6      Q    Do you understand what I'm referring to when I
 7   say "publish," Mr. Rosen?
 8      A    I believe so.  And I think the answer to that
 9   question would be:  As a copyright infringement, yes.
10      Q    What do you mean by that?                         03:07
11      A    Meaning without authorization, meaning
12   unlicensed.
13      Q    So you're aware of unlicensed publications, but
14   not any licensed publications, is that accurate?
15           MR. GAFNI:  Objection.  Vague and ambiguous as   03:07
16   to "publications."  Legal conclusion.
17   BY MR. SULLIVAN:
18      Q    Do you understand what I'm referring to when I
19   say "publication," Mr. Rosen?
20      A    I believe so.                                     03:07
21           Can you repeat the question.
22      Q    Sure.
23           MR. SULLIVAN:  Could the court reporter please
24   repeat the question.
25           (Whereupon, the record was read by the           03:07
```

Page 54

**Barry Rosen - 1/22/2014**

```
 1          reporter as follows:                              03:07

 2              "Q  Do you understand what I'm

 3          referring to when I say

 4          'publication,' Mr. Rosen?")

 5          MR. SULLIVAN:  I'm sorry.  I meant -- I'll go     03:07

 6   ahead and ask it again.

 7   BY MR. SULLIVAN:

 8      Q    Are you aware of any authorized or licensed

 9   publications of the photographic image that is on page 3

10   of Exhibit 2?                                            03:08

11      A    I don't believe there are any.

12      Q    Did you ever give copies of the image that's on

13   page 3 of Exhibit 2 to anybody?

14      A    I can't recall at this time.

15      Q    And I -- I should clarify:  Anybody other than  03:08

16   the copyright office or your attorneys.

17      A    I can't recall at this time.

18      Q    If you could turn to what's been marked as

19   Exhibit 3.  And I'll try to go through this.  I think --

20   if you could tell me what this is, in your own words     03:09

21   first.

22      A    Sorry.

23      Q    Could you identify the document that's been

24   marked as Exhibit 3 in your own words?

25      A    Are you talking about all the pages?           03:09
```

Page 55

**Barry Rosen - 1/22/2014**

```
 1      Q    Yes.                                                03:09

 2      A    It appears to be copyright registration of Ali

 3   Landry.

 4      Q    And if you look at the third page of Exhibit 3,

 5   there are one, two, three, four, five, six -- 11           03:09

 6   photographic images there.

 7           Did you take each of these photographic images

 8   that are on page 3 of Exhibit 3?

 9      A    I believe I did.

10      Q    Are you -- you believe or you're sure?             03:10

11      A    I believe I'm sure I did.

12      Q    When -- I'm asking whether or not you did.  Is

13   that that you're certain that you took these or you're

14   just -- you're not sure that you actually took these?

15           MR. GAFNI:  Objection.  Asked and answered.         03:10

16   Mischaracterizes his testimony.

17           THE WITNESS:  I took the photos.

18   BY MR. SULLIVAN:

19      Q    Do you recall when you took the photographic --

20   the -- excuse me.  Pardon me.  Strike that.                03:10

21           Do you recall when you took the photographs

22   that are on page 3 of Exhibit 3?

23      A    Not at this time.

24      Q    If you look on the first page of Exhibit 3, it

25   says, under number 3 here, 3-A:  The year in which         03:11
```

Page 56

Barry Rosen - 1/22/2014

1   creation of this work was completed, 1997."                    03:11

2        Does that sound about right for when you might

3   have taken the photographs that are on page 3 of Exhibit

4   3?

5        A    I believe so.                                        03:11

6        Q    But you don't specifically recall taking these

7   photographs, or do you?  I'm sorry.

8        A    I don't specifically recall the time that I

9   took them.

10       Q    But you do specifically recall taking the          03:11

11  photographs?

12       A    I believe so.

13       Q    Do you know why you took the photographs that

14  are on page 3 of Exhibit 3?

15       A    I can't recall at this time.                         03:12

16       Q    The subject of these photographs is Ali Landry;

17  is that correct?

18       A    I believe it is.

19       Q    Do you know whether Ms. Landry asked you to

20  take the photographs that are on page 3 of Exhibit 3?       03:12

21       A    I believe not.

22       Q    Why do you believe that she did not ask you to

23  take the photographs that are on page 3 of Exhibit 3?

24       A    I've elaborated that on multiple occasions

25  already.  I don't think I need to answer that again.          03:12

Page 57

**Barry Rosen - 1/22/2014**

1    Q    I'd ask you, if you could, to answer it, if you      03:12

2    can.

3    A    Because I don't believe she did.

4    Q    And why is that?

5         MR. GAFNI:  Objection.  Calls for speculation.      03:12

6         THE WITNESS:  I can't recall at this time.

7    BY MR. SULLIVAN:

8    Q    Do you recall whether these photographs that

9    are on page 3 of Exhibit 3 were taken as part of a

10   magazine shoot?                                          03:13

11   A    I can't recall at this time.

12   Q    Do you know whether they were taken as part of

13   a -- a shoot for product or anything like that?

14   A    I think I already answered the question.

15   Q    I believe you answered it for magazines; I          03:13

16   don't believe you answered it for any type of product or

17   placement, anything to do with, you know, product

18   advertisement, anything like that.

19   A    It wouldn't have been for product

20   advertisement.                                           03:13

21   Q    Okay.  So, again, these photographs that are on

22   page 3 of Exhibit 3, I believe you've testified -- and

23   please tell me if I'm incorrect here -- that you, for

24   most of these photographs, including the photographs

25   that are on page 3 of Exhibit 3, you initiate the taking 03:14

Page 58

Barry Rosen - 1/22/2014

1    of these photographs; is that correct?                      03:14

2           THE WITNESS:  I believe that's what I said.

3    BY MR. SULLIVAN:

4        Q    How would you contact a model like Ali Landry

5    to initiate the taking of her photographs?                  03:14

6        A    Depend on circumstances.

7        Q    Okay.  How about with respect to the

8    photographs that are on page 3 of Exhibit 3, how did you

9    contact Ms. Landry to take her photograph?

10       A    I can't recall at this time.                        03:14

11       Q    Do you contact a model -- did you contact a

12   model agency?

13          MR. GAFNI:  Objection.  Asked and answered.

14          THE WITNESS:  I can't recall at this time.

15   BY MR. SULLIVAN:                                             03:15

16       Q    Do you typically contact model agencies when

17   you're looking to take photographs of models like Ali

18   Landry?

19          MR. GAFNI:  Objection.  Vague and ambiguous.

20          THE WITNESS:  I think your statement is not        03:15

21   correct.

22   BY MR. SULLIVAN:

23       Q    Why not?

24       A    Sorry.  I'm starting to drift asleep.

25          I think I might need a second here.                  03:15

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Barry Rosen - 1/22/2014**

1     Q    Okay.  Let's -- let me ask, if you can --     03:15

2          MR. GAFNI:  Hang on a second.

3  BY MR. SULLIVAN:

4     Q    -- to answer this one question and then we can

5  take a break, if that's okay.     03:15

6     A    Okay.  Sorry.  What was the question again?

7     Q    I had asked:  Do you typically contact model

8  agencies when you're looking to take photographs of

9  models like Ali Landry?

10         And you had said that you felt my statement was     03:15

11  not correct.

12         And I asked why not.

13    A    Because she probably wouldn't be with a

14  modeling agency.

15    Q    Okay.     03:16

16         MR. GAFNI:  He needs --

17         MR. SULLIVAN:  We can take a break.  That's

18  okay.

19         THE VIDEOGRAPHER:  Off the record.  The time is

20  3:16 p.m.     03:16

21         (Recess taken.)

22         THE VIDEOGRAPHER:  On the record.  The time is

23  3:26 p.m.

24  BY MR. SULLIVAN:

25    Q    Mr. Rosen, when we took a break, I was just     03:26

Page 60

**Barry Rosen - 1/22/2014**

```
 1    asking how you might go about getting someone like Ali          03:26
 2    Landry to come to a photo shoot.
 3          And do you have any idea how you might get
 4    someone like Ali Landry to come to a photo shoot such as
 5    the one you took or -- pardon me, that would have led to         03:27
 6    the photographs that are on page 3 of Exhibit 3?
 7       A    Depend on the situations.
 8       Q    What do you mean by that?
 9       A    I don't know how to elaborate.  I'm starting to
10    drift here.  I'm running out of juice today.                    03:27
11       Q    What do you mean, you're running out of juice
12    today?
13       A    Meaning I'm just getting to the point where I'm
14    not sure how much longer I can keep my eyes open.  I've
15    been up since, like, 5 o'clock this morning and all over        03:28
16    the place, and I'm starting to wind down.
17       Q    Okay.  Are you able to answer my questions?
18       A    I'm just struggling to stay awake right now.
19       Q    Do you think you'll be able to stay awake long
20    enough to answer my questions today or --                       03:28
21       A    Not for a whole lot longer.
22       Q    How much -- so let's -- let's go through what
23    we can.
24       A    If I can go somewhere and take a nap for a
25    little bit.                                                     03:28
```

Page 61

**Barry Rosen - 1/22/2014**

1      Q    Are you able to answer the questions now or                 03:28

2  what do you need to do, Mr. Rosen?

3      A    I might have to try and take a nap, if you

4  wanted to try and continue.

5      Q    I'm not sure that we've got the time to do                   03:29

6  that.

7          MR. SULLIVAN:  Mr. Gafni, would you like to

8  have a discussion off the record or how do you want to

9  handle this?

10         MR. GAFNI:  My client is his own man.  I'm                    03:29

11  happy to talk with him off the record to see if he's

12  able to continue.

13         MR. SULLIVAN:  Well, he's told me that he's not

14  able to continue, is what I'm hearing from him, but

15  obviously, we've got a lot of questions left to go                   03:29

16  through.  And unless we -- I don't know how else to

17  proceed if he's telling me that he can't go on right

18  now.

19         MR. GAFNI:  Well, let me -- let me talk with

20  him.                                                                 03:29

21         MR. SULLIVAN:  Okay.  Shall we go off the

22  record?

23         THE VIDEOGRAPHER:  Thank you.  Off the record.

24  The time is 3:29 p.m.

25         (Recess taken.)                                               03:29

Page 62

**Barry Rosen - 1/22/2014**

```
1            THE VIDEOGRAPHER:  On the record.  The time is          03:32
2    3:32 p.m.
3    BY MR. SULLIVAN:
4       Q    Mr. Rosen, before we took a break, I had asked
5    you how you might get someone like Ali Landry to come to     03:32
6    a photo shoot that you were initiating.
7            And you had said that it depends on the
8    situation.
9            And I had asked what do you mean by that.
10      A    Honestly, I couldn't tell you at this time.           03:32
11      Q    Do you have a number of models' numbers at your
12   disposal in a Rolodex, something like that?
13      A    I would say, probably not.
14      Q    Does someone give you their phone numbers?  Do
15   you contact someone to arrange the photo shoots?             03:33
16           MR. GAFNI:  Objection.  Compound.  Vague and
17   ambiguous.
18           THE WITNESS:  I think every situation is
19   different and I couldn't begin to tell you.
20   BY MR. SULLIVAN:                                              03:33
21      Q    Okay.
22      A    At this moment.
23      Q    So in a typical circumstance -- how about --
24   how about giving me some examples of some of the
25   situations.  Just one example.                               03:33
```

Page 63

**Barry Rosen - 1/22/2014**

1        A    I can't think of anything right at this time.        03:33

2        Q    You just said there are, you know, different

3    situations and every situation is different.  How about

4    one of the situations?

5        A    Sorry.  I'm -- just lost you there.        03:34

6        Q    I was just asking for an example of one of the

7    situations where you might be initiating a photo shoot,

8    how that would come to happen.

9        A    I couldn't tell you at this moment.

10        Q    And why is that?        03:34

11        A    My brain is just a fog.

12        Q    So you just can't answer the question because

13    you're tired; is that correct?

14        A    I would say so.  Yes.

15        Q    Do you think if you weren't tired, you'd be        03:34

16    able to answer the question?

17        A    I couldn't tell you at this time.

18        Q    Going to Exhibits 2 and 3.  Do you recall what

19    deposit material you submitted with the applications for

20    the copyright registrations that are shown in Exhibit 2        03:35

21    and 3?

22        A    I couldn't tell you at this time.

23        Q    And why is that?

24        A    Because I can't recall.

25        Q    Is that again because you're tired or because        03:35

Page 64

**Barry Rosen - 1/22/2014**

1    you just can't recall?                                    03:35

2        A    Just can't recall at this moment.

3        Q    Is that, again, just general, you don't recall

4    or is it as a result of you being tired, Mr. Rosen?

5        A    All I can tell you is I just can't recall at    03:35

6    this time.

7        Q    For Exhibit 1, which was, if you'll recall, if

8    you -- and you have it there in front of you, a

9    copyright registration for the photographic image of

10   Erika Eleniak.                                            03:36

11            Do you recall whether you gave Ms. Eleniak a

12   copy of the photograph that's on page 3 of Exhibit 1?

13       A    I can't recall at this time.

14       Q    Again, is that because you're tired or because

15   you don't have a general recollection of it?             03:36

16       A    I just can't recall at this time.

17            MR. GAFNI:  He's not looking well.  Let me --

18   let me take a break and see what the best thing is to do

19   here.

20            MR. SULLIVAN:  Okay.  We'll go off the record.   03:36

21            MR. GAFNI:  Sorry.

22            THE VIDEOGRAPHER:  Off the record.  The time is

23   3:36 p.m.

24            (Recess taken.)

25            THE VIDEOGRAPHER:  On the record.  The time is   04:08

Page 65

**Barry Rosen – 1/22/2014**

1    4:08 p.m.                                                                04:08

2    BY MR. SULLIVAN:

3        Q    Mr. Rosen, are you feeling better?

4        A    A little bit.

5        Q    My understanding is we're going to try to                      04:08

6    proceed with the questions and go with what we can.

7             I want to -- is that accurate?

8        A    Yeah.

9        Q    Okay.  I want to return to a couple of

10   questions I asked earlier, and you had -- you had stated    04:09

11   that you couldn't recall at this time.  We were trying

12   to determine whether or not that was because you were

13   tired at the time or you just couldn't generally recall.

14            I'm going to ask these questions again and ask

15   that you answer them, even though I've asked them          04:09

16   already.

17            Do you recall, for Exhibit 1, which, again, is

18   the copyright registration for the photographic image of

19   Erika Eleniak, whether you gave Ms. Eleniak a copy of

20   the photograph that's on page 3 of Exhibit 1?              04:09

21       A    I can't recall at this time.

22       Q    Is that because you're just not able to recall

23   because you're tired now or you just don't have a

24   general recollection of it?

25       A    I'd say principally because I'm just tired now.   04:10

Page 66

**Barry Rosen - 1/22/2014**

1    Q    Do you think if you went back and looked at          04:10

2    your records, you would have any better recollection of

3    whether or not you gave the photograph that's on page 3

4    of Exhibit 1 to Ms. Eleniak?

5    A    I couldn't speculate on that at this time.          04:10

6    Q    Do you have any records that would show whether

7    or not you gave the photograph that's on page 3 of

8    Exhibit 1 to Ms. Eleniak?

9    A    I can't recall at this time.

10   Q    If you had provided the photograph that's on        04:10

11   page 3 of Exhibit 1 to Ms. Eleniak, would you have sent

12   that via e-mail, just given her a hard copy?  How would

13   you have done that?

14        MR. GAFNI:  Objection.  Vague and ambiguous.

15   Incomplete hypothetical.                                 04:11

16        THE WITNESS:  I guess I can't recall

17   circumstances.  I couldn't give you an answer.

18   BY MR. SULLIVAN:

19   Q    Do you have a Web site, Mr. Rosen?

20   A    No, I do not.                                        04:11

21   Q    Are you aware that there's a Web site called

22   "Barry Rosen Photography"?

23   A    I believe so.

24   Q    And that's not your Web site?

25   A    No.                                                  04:11

Page 67

**Barry Rosen - 1/22/2014**

```
1       Q    Did you ever post any of your photographs to          04:11
2   the Internet?
3       A    No.
4       Q    Have you ever sent any of your photographs via
5   e-mail?                                                         04:11
6            MR. GAFNI:  Objection.  Vague and ambiguous.
7            THE WITNESS:  I can't recall at this time.
8   BY MR. SULLIVAN:
9       Q    How long have you been a professional
10  photographer, Mr. Rosen?                                        04:12
11      A    I believe more than 30 years.
12      Q    Do you have an e-mail account?
13      A    Yes.
14      Q    And during that 30-year period, you don't
15  recall ever sending any e-mails with any photographs           04:12
16  attached to it that you might have taken?
17      A    At this time, no.
18      Q    Is that because you don't recall specifically
19  sending any or is that because you're tired and you
20  can't recall at this time because of that reason?              04:12
21      A    Principally, because I'm just tired at this
22  time and I just can't focus.
23      Q    I also want to return to another question I had
24  asked before we took our last break.  I want to see if
25  you have any better recollection now.                          04:13
```

Page 68

**Barry Rosen - 1/22/2014**

1        With respect to Exhibit 2 and 3, do you recall          04:13

2    what deposit material you submitted with your

3    applications for copyright registration?

4        MR. GAFNI:  Okay.  Asked and answered.

5        THE WITNESS:  I can't recall at this time.          04:13

6    BY MR. SULLIVAN:

7    Q    And that's because you're tired; is that

8    correct?

9    A    (Witness nods head up and down.)

10   Q    Is that a "yes"?          04:13

11   A    Yes.

12   Q    How would someone get the photographic images

13   that are the subject of this dispute to use them in

14   the -- in the ways that you've alleged they have been

15   used on these photographic prints or on the posters,          04:14

16   that sort of thing?

17       MR. GAFNI:  Objection.  Vague and ambiguous.

18   Calls for speculation.  Incomplete hypothetical.

19       THE WITNESS:  I have --

20       MR. GAFNI:  You can answer if you'd like to --          04:14

21       THE WITNESS:  I have no idea at this time.

22   BY MR. SULLIVAN:

23   Q    Have you ever asked any of these third-party

24   sellers how they got your images?

25   A    I've tried.          04:14

Page 69

Barry Rosen - 1/22/2014

| | | |
|---|---|---|
| 1 | Q    How have you tried? | 04:14 |

1     Q    How have you tried?                              04:14

2     A    Via attorneys asking, asking questions of them

3  in, you know, various ways.  But I can't recall at this

4  moment everything.

5     Q    And what answers have you received as to how     04:15

6  they've gotten your images?

7     A    They usually don't like to answer.

8     Q    Have they ever answered?

9     A    Very rarely.

10    Q    In those rare instances where they have, what    04:15

11 have they said?

12         MR. GAFNI:  Objection.  Vague and ambiguous as

13 to "they."

14         Do you mean generally, like people --

15         MR. SULLIVAN:  The ones that have answered.       04:15

16         MR. GAFNI:  But are you talking about images in

17 this case?  Are you talking about, generally, images

18 that have been infringed upon when he's asked

19 third-party sellers?  What is the --

20         MR. SULLIVAN:  Well, he, Mr. Rosen, testified     04:15

21 that he has tried to ask any third-party sellers that

22 have used his images how they got his images.

23         MR. GAFNI:  Okay.  So you're --

24         MR. SULLIVAN:  I then asked how he's tried.

25         He said via attorneys.                            04:15

**Barry Rosen - 1/22/2014**

1      Q     Just in general, any photographic images you've          04:24

2    taken.

3      A     Very rarely ever.

4      Q     But you have?

5      A     Possibly.                                                 04:24

6      Q     Do you know whether any copies of the

7    photographic images at issue in this lawsuit appear

8    elsewhere on the Internet?

9      A     I'm sorry.  Can you repeat the question.

10      Q     Sure.                                                    04:24

11            Do you know whether copies of the photographic

12    images that are at issue in this lawsuit appear

13    elsewhere on the Internet?

14            MR. GAFNI:  Objection.  Vague and ambiguous.

15            Elsewhere as to where?                                  04:24

16    BY MR. SULLIVAN:

17      Q     Okay.  Let me ask -- let me ask generally

18    first.

19            Do you know whether copies of the photographic

20    images that are at issue in this lawsuit appear on the          04:25

21    Internet currently?

22      A     I believe some of them.

23      Q     Do you know where they appear, on what sites?

24      A     Usually, if I find them, I send notices on

25    them.  So I couldn't tell you.                                  04:25

Page 77

**Barry Rosen - 1/22/2014**

1       Q    How do you find -- or let me be more specific.        04:25

2            How did you find that the photographic images

3    at issue in this lawsuit appear on the Internet

4    currently?

5       A    I couldn't tell you at this time.        04:25

6       Q    Do you surf the Internet looking for these

7    photographic images at issue in this lawsuit?

8       A    I would say so, yes.

9       Q    How often do you surf the Internet looking for

10   the photographic images at issue in this lawsuit?        04:26

11      A    Difficult to say.

12      Q    Why is it difficult to say?

13      A    Because there's no way to easily answer that

14   question.

15      Q    Why is that?        04:26

16      A    I mean, I would say it varies depending on the

17   day.

18      Q    Do you surf the Internet every day looking

19   for -- and I'm speaking right now specifically to these

20   photographic images that are at issue in this lawsuit.        04:26

21           I'll ask generally, as well, but specifically

22   with respect to these, do you -- do you access the

23   Internet every day and look for these images?

24      A    I look generally for my images on the Internet.

25      Q    Every day?        04:27

Page 78

**Barry Rosen - 1/22/2014**

1      A     Depends on scheduling, but as much as possible,      04:27
2    I would say so.
3      Q     Okay.  But at least a few times a week, is that
4    accurate to say, that you'd surf the Internet looking
5    for your photographic images?      04:27
6      A     It depends.  I would say -- yeah.  Depends.
7      Q     Two, three times a week, on average?
8      A     Could -- could be every day.
9      Q     Okay.  Could be every day, you said?
10     A     (Witness nods head up and down).      04:27
11     Q     Did you look on the Internet today for any of
12   your photographic images?
13     A     I didn't have any time to do so yet today.
14     Q     Did you look yesterday for any of your
15   photographic images?      04:27
16     A     Yes, I did.
17     Q     Did you find any?
18     A     I can't recall.  I believe I might have.
19     Q     What did you do when you found them?
20     A     Sent a notice, which is what I always do.      04:28
21     Q     When you say "sent a notice," are you referring
22   to a DMCA take-down notice?
23     A     Exactly.
24     Q     Do you prepare your own DMCA take-down notices?
25     A     I do.      04:28

Page 79

**Barry Rosen - 1/22/2014**

1        Q       In every instance?                                    04:28

2        A       I believe so.

3        Q       Anyone ever prepare a DMCA take-down notice for

4    you?                                                              04:28

5                MR. GAFNI:  Objection.  Calls for speculation.        04:28

6                THE WITNESS:  To the best of my knowledge, no.

7    BY MR. SULLIVAN:

8        Q       Well, at your direction, has anyone ever

9    prepared a DMCA take-down notice for you?

10       A       I don't believe so.                                   04:28

11       Q       Do you recall whether you sent a DMCA take-down

12   notice -- or sorry.  Strike that.

13               Do you recall whether you prepared a DMCA

14   take-down notice yesterday?

15       A       At this moment, I can't recall.                       04:29

16       Q       Have you ever been paid for the use of any of

17   the photographic images at issue in this lawsuit?

18       A       To the best of my knowledge, I don't believe

19   so.

20       Q       Have you ever provided any of the photographic        04:30

21   images at issue in this lawsuit to a stock photo

22   service, like Getty Images?

23       A       I can't recall at this time.

24       Q       Do you have any records that would show whether

25   or not you sent any of the photographic images at issue        04:30

Page 80

Barry Rosen - 1/22/2014

1    in this lawsuit to Getty Images or any other type of                04:30

2    stock photo services?

3         A    I don't believe I do.

4         Q    Have you ever sent any other photographic

5    images to a stock photo service like Getty Images?              04:31

6         A    I can't recall at this time.

7         Q    But it's possible?

8         A    Couldn't tell you at this moment.

9         Q    Have you ever been paid by Getty Images or any

10   other sort of stock photo service for the licensing of            04:31

11   any of your photographic images?

12        A    I really can't recall at this time.

13        Q    Would you have any records that would show

14   whether or not you got paid by Getty Images or any other

15   stock photo service for licensing of any of your                 04:32

16   photographic images?

17             MR. GAFNI:  I'm going to interpose an objection

18   as to "stock photo service," like Getty Images.

19             If you understand what he means, go ahead.  I

20   just don't want there to be any confusion about that,            04:32

21   what a stock photo service is.

22             THE WITNESS:  Yeah.  I can't recall at this

23   time.

24   BY MR. SULLIVAN:

25        Q    So when you say you can't recall at this time,         04:32

Page 81

**Barry Rosen - 1/22/2014**

1    which the photo could be sold, is that -- is that          04:49

2    accurate?  Or licensed?  Sorry.  I apologize for that.

3        A    I believe that would be the case.

4        Q    And the other factors that you can't recall

5    right now, correct?                                          04:50

6        A    Yeah.

7        Q    If you turn to the page marked Rosen-117 at the

8    bottom.  You see this is for -- it appears, from the

9    face of this document, to be an invoice for the

10   licensing of a photograph, again, of Anna Kournikova.       04:50

11            Does that appear correct?

12       A    I believe so, yes.

13       Q    And here the amount's $8,000 rather than the

14   $10,000.

15            Do you recall why the price differed between       04:50

16   the two invoices that are part of Exhibit 4, related to

17   photographs of Anna Kournikova?

18       A    I can't recall at this time.

19       Q    Do you know why the information related to --

20   it appears in the top left that there is a blackout box     04:50

21   at the top.  Do you know why that information was

22   blacked out?

23       A    I can't recall at this time.

24       Q    Did you black that information out?

25       A    I can't recall at this time.                       04:51

Page 91

**Barry Rosen – 1/22/2014**

| | | |
|---|---|---|
| 1 | Q    Did your attorney black that information out? | 04:51 |
| 2 | A    I can't recall at this time. | |
| 3 | Q    Do you know what publication this photograph of | |
| 4 | Anna Kournikova was licensed to? | |
| 5 | A    I can't recall at this time. | 04:51 |
| 6 | Q    Switching back to the photographs at issue in | |
| 7 | this lawsuit.  Do you know how much they were listed for | |
| 8 | sale on Amazon's Web site? | |
| 9 | A    I can't recall at this time. | |
| 10 | Q    Has the posting of the photographs at issue in | 04:52 |
| 11 | this lawsuit on Amazon.com's Web site, by these | |
| 12 | third-party sellers, diminished the value of your | |
| 13 | photographs in any way? | |
| 14 | MR. GAFNI:  Objection.  Vague and ambiguous as | |
| 15 | to "by these third-party sellers" and what posting | 04:53 |
| 16 | you're referring to. | |
| 17 | And calls for a legal conclusion. | |
| 18 | BY MR. SULLIVAN: | |
| 19 | Q    You can answer if you understand. | |
| 20 | A    I wouldn't know how to answer the question.  I | 04:53 |
| 21 | would defer to my attorney on that. | |
| 22 | Q    We've been through this a little bit in your | |
| 23 | prior deposition testimony, but I'm not sure we got | |
| 24 | complete answers on that. | |
| 25 | How many lawsuits, copyright infringement | 04:53 |

Page 92

**Barry Rosen - 1/22/2014**

1    lawsuits have you filed?                                          04:54

2        A    I would have no idea.

3        Q    More than 20?

4        A    I believe so.

5        Q    More than 30?                                            04:54

6        A    Not certain, but it's possible.

7        Q    Would you say somewhere between 20 and 40 or

8    more?

9        A    I have no idea exact amount.

10       Q    I don't need the exact amount, just a range.             04:54

11       A    I have no idea the exact range.

12       Q    Less than 100?

13       A    Probably.

14       Q    So somewhere between 20 and 100 is --

15       A    I would think so.                                        04:54

16       Q    Would you say you're pretty familiar with

17   copyright law?

18            MR. GAFNI:  Objection.  Vague and ambiguous.

19   Argumentative.  Calls for a legal conclusion.

20            THE WITNESS:  I think I'll defer to my attorney           04:55

21   on that.

22   BY MR. SULLIVAN:

23       Q    Well, I was just asking you whether you feel

24   that you're familiar -- pretty familiar with copyright

25   law.                                                              04:55

Page 93

**Barry Rosen - 1/22/2014**

```
 1            MR. GAFNI:  Objection.  Vague and ambiguous.    04:55
 2    Calls for a legal conclusion.  Argumentative.
 3            THE WITNESS:  Yeah.  I'll defer to my attorney
 4    on that one.
 5    BY MR. SULLIVAN:                                         04:55
 6        Q    Why would you defer to your attorney?  What do
 7    you mean?
 8        A    I would -- I think it calls for a legal
 9    conclusion and I don't think I can answer that question.
10        Q    I'm going to at this time ask the court          04:56
11    reporter to identify three exhibits, mark them next in
12    order as Exhibits 5, 6, and 7.
13            MR. SULLIVAN:  First, for Exhibit 5, a document
14    Bates range at the bottom, Rosen-4 through Rosen-10.
15            There's a title at the top, "DMCA Notice of       04:57
16    Copyright Infringement."
17            (Exhibit 5 was marked for identification
18            and is annexed hereto.)
19    BY MR. SULLIVAN:
20        Q    And then Exhibit 6 is a document, Bates range    04:57
21    Rosen-25 through Rosen-29.  Again at the top it says
22    DMCA notice of copyright infringement.  And I apologize.
23    The date on this one is May 26, 2011.  That's the date
24    at the top.
25            (Exhibit 6 was marked for identification          04:58
```

Page 94

**Barry Rosen - 1/22/2014**

1       A    I see an e-mail from them that they did          05:25

2   respond.

3       Q    Do you recall what that e-mail said?

4       A    It's right here (indicating).

5       Q    Can you just reference the number at the bottom   05:25

6   of that page when you're saying, "it's right here," what

7   you're looking at?

8       A    000009.

9       Q    And that's in Exhibit 5.

10          Okay.  So this is the e-mail from Amazon to       05:25

11  you; is that correct?

12      A    I believe it is.

13      Q    And did you do anything in response to this

14  e-mail that was sent by Amazon?  It looks -- I'm sorry.

15  Strike that.                                              05:26

16          Can you tell me, at the top here, what date

17  that e-mail was sent?

18      A    Appears to be December 20th, 2010.

19      Q    Do you recall responding to that e-mail?

20      A    I don't recall at this time.                     05:26

21      Q    Do you recall whether you did anything to

22  follow up on that e-mail?

23      A    I don't recall at this time.

24      Q    Did you ever search Amazon's site to see

25  whether the images that were the subject of your DMCA     05:26

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

```
1    notice had been taken down?                           05:26
2        A    I don't recall at this time.
3        Q    Did you ever search any other Web site, whether
4    it be through Google or any other search engine, to see
5    whether the images were available after you sent this   05:27
6    DMCA notice?
7        A    I don't recall at this time.
8        Q    Do you recall stating in your declaration in
9    support of partial summary judgment that you followed up
10   on January 31, 2011?                                    05:27
11       A    I see that in my declaration.
12       Q    But you don't recall that?
13       A    At that moment, no, I don't recall.
14       Q    And is that -- you don't recall doing that at
15   all on January 31 --                                    05:28
16            MR. GAFNI:  Objection.  Vague and ambiguous --
17   BY MR. SULLIVAN:
18       Q    -- 2011?
19            MR. GAFNI:  Are you asking whether --
20            MR. SULLIVAN:  Hold on.  Let me finish my       05:28
21   question and then certainly put your objections in, but
22   let me finish my question.
23   BY MR. SULLIVAN:
24       Q    I was just going to say, you don't recall
25   following up on January 31, 2011?                       05:28
```

Page 104

**Barry Rosen - 1/22/2014**

```
1        A     At this moment, I don't recall a whole lot of        05:28
2     anything.
3        Q     Is that, again, because you're -- you're tired
4     or on medication?
5        A     Just winding down the day here, and it's             05:28
6     just -- it's getting more and more difficult.  I'm
7     trying to persevere.
8             MR. SULLIVAN:  Let's take a break.  I'm going
9     to go off the record for a minute.
10            THE VIDEOGRAPHER:  Off the record.  The time is       05:29
11     5:29 p.m.
12            (Recess taken.)
13            THE VIDEOGRAPHER:  On the record.  The time is
14     5:36 p.m.
15     BY MR. SULLIVAN:                                             05:36
16        Q     So, Mr. Rosen, we were just referring to
17     Exhibit 5, which was your DMCA notice to Amazon related
18     to the Erika Eleniak image that is at issue in this
19     lawsuit.
20            Do you recall ever following up on that DMCA          05:37
21     notice and to determine whether Amazon responded to it,
22     anything else?
23        A     I'm having trouble recalling at this time.  If
24     it's in my declaration, which was done at a time when I
25     wasn't so tired, et cetera, et cetera, then it's there     05:37
```

**Barry Rosen - 1/22/2014**

```
1    and that's what it is, so ...                              05:37
2        Q    Do you recall, for Exhibit 6 -- maybe take a
3    look at Exhibit 6 for a minute.
4        A    I'm going to have to give you the same answer
5    as before.  If it's in my declaration, then that's that.   05:37
6    And at the moment, I'm just not up to speed, so ...
7        Q    So, basically -- let me first, for Exhibit 6,
8    if you could just tell me what that is, in your own
9    words.
10           MR. GAFNI:  Are you okay, Barry?                    05:39
11           THE WITNESS:  (Witness nods head up and down).
12           MR. GAFNI:  He was just asking you what -- what
13   Exhibit 6 is, if you're able --
14           THE WITNESS:  Oh, sorry.  I'm spacing out here.
15           Exhibit 6 is a -- appears to be one of my DMCA     05:39
16   notices.
17   BY MR. SULLIVAN:
18       Q    And is this a DMCA notice -- sorry.  I guess
19   the first two pages of this, is that a DMCA notice
20   related to the image of Charlotte Lewis?  Is that          05:39
21   correct?
22       A    It appears to be.
23       Q    Do you recall whether Amazon responded to that
24   DMCA notice?
25       A    I can't recall at this time.  It's in my          05:39
```

Page 106

**Barry Rosen - 1/22/2014**

```
1    declaration.  Should stand on its own.                    05:39

2        Q    And you've already said this, but I just want

3    to make sure we're clear.  Is that going to be your

4    response to any of my questions related to these DMCA

5    notices and Amazon's response?                            05:40

6            MR. GAFNI:  Objection.  He didn't already say

7    this.  Assumes facts not in evidence.  Mischaracterizes

8    prior testimony.

9            MR. SULLIVAN:  Okay.

10   BY MR. SULLIVAN:                                           05:40

11       Q    Well, is that going to be your response with

12   respect to these DMCA notices that are marked as

13   Exhibits 5, 6, and 7, that you don't recall --

14       A    I believe --

15       Q    Amazon's response?                                05:40

16       A    I believe it will be.

17       Q    Do you recall what, if anything, you did to

18   follow up after you sent Amazon DMCA take-down notices,

19   the three take-down notices that are in Exhibits 5, 6,

20   or 7 -- and 7?                                             05:40

21       A    I don't recall at this time.

22       Q    Do you recall if you did anything?

23       A    I don't recall at this time.

24       Q    Do you know if you searched Amazon's Web site

25   to determine whether the images were still available?     05:41
```

Page 107

**Barry Rosen - 1/22/2014**

1       A    I don't recall at this time.                    05:41

2       Q    In your declaration, which is -- I apologize.

3   Exhibit 8.  Is that right?  I think that's right.

4            MR. GAFNI:  Uh-huh.

5   BY MR. SULLIVAN:                                          05:42

6       Q    You state that you followed up on December 16,

7   2012 with respect to all three -- I apologize.  Only

8   with respect to the Charlotte Lewis and the two Ali

9   Landry photographs, and found that the image had been

10  removed, disabled; is that correct?                       05:42

11           MR. GAFNI:  Are you reading from a -- are you

12  referring him to a particular section?

13           MR. SULLIVAN:  I'm not.  I'm just asking him.

14           THE WITNESS:  I -- I don't recall at this time.

15  If it's in my declaration, then that's probably what      05:42

16  happened.  So, you know, it's in my declaration.  I

17  mean, I don't know what more to say.

18  BY MR. SULLIVAN:

19      Q    Did you ever contact Amazon directly after

20  sending these DMCA notices about the specific images      05:43

21  that were referenced in the DMCA notices?

22           MR. GAFNI:  Objection.  Vague and ambiguous.

23  Compound.

24           MR. SULLIVAN:  You're right.  Strike that.

25  ///

Page 108

**Barry Rosen - 1/22/2014**

```
 1    BY MR. SULLIVAN:                                        05:43

 2        Q    I'll ask a better question, Mr. Rosen, because

 3    that was not a good question.

 4             For -- let's go in order.  It's just easier

 5    that way.                                               05:43

 6             For Exhibit 5, which was your DMCA notice

 7    related to the Erika Eleniak image and product, did you

 8    ever contact Amazon after sending this DMCA notice about

 9    that image again?

10        A    I don't recall at this time.                   05:43

11        Q    For Exhibit 6, which is the DMCA notice related

12    to the Charlotte Lewis image.  Excuse me.  Did you ever

13    contact Amazon directly after sending that DMCA notice

14    about that specific image, the Charlotte Lewis image?

15        A    I don't recall at this time.                   05:44

16        Q    And would your answer be the same for Exhibit

17    7?

18        A    I believe so.

19        Q    If you did attempt to reach Amazon, how would

20    you do that, via e-mail?                                05:44

21             MR. GAFNI:  Objection.  Vague and ambiguous.

22    Incomplete hypothetical.

23             THE WITNESS:  I couldn't say.

24    BY MR. SULLIVAN:

25        Q    Would you call anyone at Amazon?               05:45
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1     Q    Do you know whether that image is still

2    available online?

3     A    I believe it may not be.  But I can't be

4    certain at this time.

5     Q    Do you know whether the link that's at the

6    bottom of this page, bottom left of that page, is still

7    accessible?

8     A    I'm not certain at this time.

9          I believe a lot of the questions you're asking

10   me be in my declaration.  So I would refer you to my

11   declaration.

12         And/or Amazon's interrogatory answers.

13    Q    And would your answers be the same with respect

14   to the Charlotte Lewis image and product page, as I've

15   referred to that to --

16    A    I believe they would be.

17    Q    And with respect to the Ali Landry images and

18   product pages, as I've -- we've kind of defined that?

19    A    I believe -- I believe they would be.

20    Q    If the product page, as we've defined that, was

21   taken down by Amazon -- strike that.

22         If Amazon took down the product page, as -- as

23   we've defined that, these first pages of Exhibit 9 being

24   an example of that, would you still have a complaint

25   related to the display of the Erika Eleniak image?

05:57

05:57

05:57

05:58

05:58

05:59

**Barry Rosen - 1/22/2014**

1        MR. GAFNI:  Objection.  Vague and ambiguous.          05:59

2    Incomplete hypothetical.

3        MR. SULLIVAN:  You're right.

4        MR. GAFNI:  Calls for a legal conclusion.

5        MR. SULLIVAN:  You can stop there.  I'll strike     05:59

6    that.

7    BY MR. SULLIVAN:

8        Q    All right.  I'll just move on.

9             Do you know whether anyone accessed this

10   product page that's shown in Exhibit 9?                   06:00

11            MR. GAFNI:  Objection -- well, I'll withdraw

12   that objection.

13            THE WITNESS:  I would believe so.

14   BY MR. SULLIVAN:

15       Q    How do you know that?                            06:00

16       A    I believe probably just because being available

17   on Amazon, it was probably accessed.  And it was likely

18   accessed by Google and all the other search engines, as

19   well.  So I would have to say yes to that -- to that

20   question.                                                 06:01

21       Q    But do you know of anyone specifically that has

22   accessed this product page that's shown on Exhibit 9?

23            MR. GAFNI:  Objection.  Vague and ambiguous.

24            Do you mean anyone other than him?

25            MR. SULLIVAN:  Let him answer.                   06:01

Page 118

**Barry Rosen - 1/22/2014**

1        THE WITNESS:  I -- I would repeat what he just

2   said, anybody other than me?                                    06:01

3   BY MR. SULLIVAN:

4        Q    Yes.  Anyone other than you.

5        A    I couldn't begin to tell you at this time.            06:01

6        Q    And why is that?

7        A    Because Amazon didn't produce full documents

8   that were requested, that would have demonstrated

9   everything that we had asked for.

10       Q    So do you know now whether or not anyone             06:02

11  specifically accessed that product page, as you sit here

12  today?

13       A    I would --

14            MR. GAFNI:  Again, objection.  Vague and

15  ambiguous.  Do you mean other than --                          06:02

16            MR. SULLIVAN:

17  BY MR. SULLIVAN:

18       Q    Other than you.  I'm sorry.  Other than you.

19       A    Just based on my general knowledge of the way

20  things work, I would say absolutely 100 percent.              06:02

21       Q    And who would those people be that accessed

22  that product page?

23       A    For sure, the search engines.

24       Q    How do you know that?

25       A    Because it's commonplace pretty much for --         06:02

**Barry Rosen - 1/22/2014**

1   based on my knowledge of stuff, for pretty much                    06:02

2   everything on Amazon to end up on Google and elsewhere.

3       Q    How does it end up on Google and elsewhere?

4       A    That, I couldn't be certain, whether Amazon

5   puts it there, whether Google searches Amazon, whether            06:03

6   there's an operational relationship.  I have no idea.

7            It wasn't disclosed by Amazon and I'm not sure

8   if we requested it, but, you know, it's information I

9   still would love to know from Amazon.

10      Q    And that information would be how the images or           06:03

11  the product pages appear on Google; is that right?

12      A    Amongst other places, yes.

13      Q    What other places?  We talked about Google.

14  Where else?

15      A    Well, there's -- there's multiple search                  06:03

16  engines besides Google.  And I'm sure there's other

17  people.  I can't think of things at the moment, but I

18  know that there's a whole plethora of situations.

19      Q    Well, specifically --

20      A    That are likely.                                          06:03

21      Q    Sorry.  I didn't mean to -- to interrupt your

22  answer there.

23           Were you done?

24      A    Yeah.  I'm done.

25      Q    So, for example, Bing, would that be one?                 06:04

**Barry Rosen - 1/22/2014**

1      A    I believe so, yes.                                06:04

2      Q    Any others?

3      A    Couldn't tell you off the top of my head, but

4   I'm sure there's a whole bunch of them that I'm not

5   thinking of right now.  I know there are, I just can't   06:04

6   think of them off the top of my head.

7      Q    So essentially, within this category, it would

8   be search engines like Google and Bing?

9      A    That would be one, but I'm sure other people

10  have seen the stuff too, just because it's on Amazon.    06:04

11     Q    But are you -- do you know of any other

12  specific people that have seen this?

13     A    Not that I could tell you at this time.

14          Not that I could recall at this time.

15     Q    Did you ever search Google for the Erika        06:04

16  Eleniak image?

17     A    I can't recall at this time.

18     Q    Did you ever search Google for the Charlotte

19  Lewis image?

20     A    Can't recall at this time.                       06:05

21     Q    And --

22     A    To save you some time, it's possible with any

23  of them or all of them, but I can't recall specifics.

24     Q    Did you ever see -- strike that.

25          If I could refer you to your declaration.  It's  06:06

**Barry Rosen - 1/22/2014**

| | | |
|---|---|---|
| 1 | marked as Exhibit 8.  Paragraph 44, which is on page 11. | 06:06 |
| 2 | And actually, before we do that, just for completeness | |
| 3 | purposes, if you could turn the page to -- to the next | |
| 4 | page, which is page 12. | |
| 5 | A      (Witness complies.) | 06:06 |
| 6 | Q      Is that your signature on page 12 of Exhibit 8? | |
| 7 | A      It appears to be. | |
| 8 | Q      Is that a "yes" or -- | |
| 9 | A      I believe so. | |
| 10 | Q      Okay.  Do you have any reason to believe that | 06:06 |
| 11 | this is not the declaration that you submitted in | |
| 12 | support of a motion for partial summary judgment that | |
| 13 | you filed in this case? | |
| 14 | A      Given that you presented it, anything is | |
| 15 | possible.  So, therefore, I -- I -- you know, unless it | 06:06 |
| 16 | came from my own hands, I wouldn't, you know, since -- | |
| 17 | since its source is -- is unknown to me, I -- I can't | |
| 18 | really comment. | |
| 19 | Q      And I'd ask you to take a minute and look | |
| 20 | through this and tell me whether this is the declaration | 06:07 |
| 21 | you submitted in support of the motion for partial | |
| 22 | summary judgment or if you have any reason to believe | |
| 23 | that it is not. | |
| 24 | A      I couldn't tell you because I have no idea -- | |
| 25 | no idea of the source.  And I don't see any court | 06:07 |

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1    numbering on it, so therefore, I -- I can't tell you                    06:07

2    anything about it.

3        Q    Could you take a minute and read through it.

4    And then just let me know whether you have any reason to

5    believe any of the statements were not statements you          06:07

6    made in your declaration.

7        A    Well, given that I don't know its source, and

8    given that, I can't verify.  Because if it had the court

9    imprint on top of it, then I would be much more apt to

10   say something.  But since it's missing certain things, I       06:08

11   can't really tell you anything about it since you're the

12   one that presented it to me.  Therefore, I -- I really

13   hesitate to say much else about it.

14       Q    Okay.  I'll represent to you that this is your

15   declaration that was filed under seal, which is why it         06:08

16   doesn't have any of the court markings on it.  And we'll

17   continue on with my representation that this is, in

18   fact, your declaration.

19            Did you read your declaration prior to signing

20   it?                                                            06:08

21       A    I believe I did.

22       Q    Then can you turn back -- we'll go back to page

23   11, paragraph 44.

24       A    If it's here, it's here.  I don't know why you

25   persist in asking me questions.  If it's here, it's            06:09

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1     here.

2          You know, I -- I can't really elaborate much

3     more on anything, so -- and all you're doing is just

4     really just -- I'm so tired and I'm just -- you know,

5     you're just basically beating a dead horse.

6     Q    Well, I have some specific questions related to

7     some of the statements you have here, so --

8     A    And my -- my answer's going to be:  If it's

9     here, it's here.  You know, that's all I can really say

10    at this time.

11    Q    Okay.  Well, I'm going to go ahead and ask my

12    question for the record and then, you know, your

13    response can be however you -- you need it to be,

14    Mr. Rosen.  That's completely fine with me.  But I do

15    need to ask questions for the record.  And I am entitled

16    to your best testimony here today, so I'd appreciate it

17    if you could at least, you know, follow along and then

18    respond as you need to.

19          So paragraph 44, if you could take a look at

20    that.

21    A    (Witness complies.)

22    Q    You state here -- and for benefit -- you don't

23    have your glasses, so I'll read just the part that I'm

24    referencing here, to you, that -- here, you've got a

25    statement that you're aware that -- and this is in the

06:09
06:09
06:09
06:09
06:10
06:10

**Barry Rosen - 1/22/2014**

```
1    middle of 44:  I'm aware -- I'm sorry:                06:10

2                 "...am aware that the URL

3            addresses and images would have been

4            publicly available via search engines

5            such as Google and Bing, which I've       06:10

6            crawled and regularly continue to

7            crawl Amazon.com, as long as the

8            images were active on Amazon's

9            publicly available servers."  [as

10           read]                                      06:10

11           And the next sentence:

12                "It was via such a search

13           that I discovered one of the

14           infringements at issue in this case."

15           [as read]                                  06:11

16           Do you recall making that statement, Mr. Rosen,

17    in your declaration?

18      A    I stand upon what I said earlier.  If it's

19    here, it's here.  That's my statement, so ...

20      Q    When you're referring to the -- one of the   06:11

21    infringements in this case, what are you referring to?

22      A    Specifically, I don't recall at this time.

23      Q    And when you say it was via such a search, are

24    you referring to a search on Google or Bing?

25      A    I would believe that's the case.            06:11
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1      Q    Do you know which service you used to search?          06:11

2      A    I couldn't tell you at this moment in time.

3      Q    Did you print or save any images from that

4    search that you ran?

5      A    I don't believe I did, but I can't recall at          06:11

6    this time.

7      Q    Do you know when you would have run that

8    search?

9      A    I couldn't tell you at this time.

10      Q    Do you have any records that might show whether          06:12

11    you saved or printed -- sorry.  Strike that.

12          Do you have any records that might show which

13    service you used to conduct the search?

14      A    I couldn't tell you at this time.

15      Q    Have you ever filed a lawsuit against anyone          06:13

16    else related to the same -- excuse me, the same images

17    that are at dispute in this lawsuit?

18      A    I can't recall at this time.

19      Q    Did your file a lawsuit against JG Autographs          06:13

20    related to any of the photographs at issue in this

21    lawsuit?

22      A    It's possible.

23      Q    Do you know which photograph might have been

24    involved in that lawsuit?

25      A    I can't recall at this time.          06:13

Page 126

Barry Rosen - 1/22/2014

1      Q     If a -- does the name -- the case name "Rosen V      06:13
2  Autograph World LLC," case number 11-CD 05462, does that
3  mean anything to you?
4      A     A little bit, but not so much at the moment.
5      Q     Are you aware that that lawsuit involved the       06:13
6  same photographic image of Ali Landry and Charlotte
7  Lewis?
8      A     Not at this moment in time, I'm not.
9      Q     And are you aware that it involved -- or sorry.
10 Strike that.                                                  06:14
11          Do you know whether it involved the same
12 product, any of the same products that are at issue in
13 this lawsuit?
14     A     I can't recall at this time.
15     Q     Have you ever communicated with anyone at JG       06:14
16 Autographs?
17     A     I don't believe I have.
18     Q     Have you ever -- and by communicate -- sorry.
19 I'll break that down.
20          Have you ever had a telephone conference with       06:14
21 anyone at JG Autographs?
22     A     I very much doubt it.
23     Q     Sent any e-mails to anyone at JG Autographs?
24     A     I very much doubt it, but I can't recall at
25 this time.                                                    06:14

Page 127

**Barry Rosen - 1/22/2014**

1      Q     You entered into a settlement agreement with JG     06:14

2    Autographs; is that correct?

3      A     I couldn't tell you at this time.

4            MR. GAFNI:  Objection.  Vague and ambiguous.

5    Calls for of confidential communications pursuant to     06:15

6    potential settlement discussions.

7            MR. SULLIVAN:  The fact that he entered into

8    it?

9            I mean, it's fine.  Assert your objections.  I

10   won't ask.                                                06:15

11   BY MR. SULLIVAN:

12     Q     Are you aware that you -- your attorney filed a

13   document stating that you settled and entered into a

14   settlement with JG Autographs in the Rosen V Autograph

15   World case?                                               06:15

16     A     I'm not aware of it at this time.

17     Q     Did you license any of -- I'm -- strike that.

18           Do you know who Arrick's Collectables is?

19     A     I have no idea.

20     Q     Are you aware that they're one of the            06:15

21   third-party sellers that are involved in the -- excuse

22   me, that you allege posted for sale one of the products

23   at issue in this lawsuit?

24     A     I believe that might be the case.

25     Q     Ever communicated with anyone at Arrick's        06:16

Barry Rosen - 1/22/2014

```
 1    Collectables?                                              06:16

 2        A    I don't believe I ever have.

 3        Q    Ever been paid money by Arrick's Collectables

 4    related to any of the photographs at issue in this

 5    lawsuit?                                                   06:16

 6        A    No, I don't believe I ever have.

 7        Q    Ever entered into a settlement agreement with

 8    Arrick's Collectables related to any of the photographs

 9    at issue in this lawsuit?

10        A    No, I don't believe I ever have.             06:16

11        Q    Do you know who Magsnmoreamaz is?

12        A    I have no idea.

13        Q    Have you ever filed a lawsuit against

14    Magsnmoreamaz?

15        A    I have not, to the best of my knowledge.     06:16

16        Q    Ever communicated with anyone at Magsnmoreamaz?

17        A    To the best of my knowledge, I have not.

18        Q    Have you ever been paid money by Magsnmoreamaz

19    related to any of the photographs at issue in this

20    lawsuit?                                                   06:17

21        A    To the best of my knowledge, I have not.

22        Q    Do you know who Mark Lister is?

23        A    I have no idea.

24        Q    Let's go off the record for a minute.

25             THE VIDEOGRAPHER:  Off the record.  The time is  06:17
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Barry Rosen - 1/22/2014**

1      Q      And can you tell me what this document is                    06:26

2      that's the first page of Exhibit 10, Rosen-56?

3      A      Appears to be an Amazon invoice.

4      Q      Can you see reference --

5      A      Or -- or something to that effect.                           06:27

6      Q      And do you see reference to, in the second

7      box -- there's two boxes here.  In the second box, under

8      "Quantity 1" and then "Product Details," it says "Ali

9      Landry eight-by-ten photo Number 1935."

10             Do you see that?                                            06:27

11     A      I see that.

12     Q      Do you know why Mr. Ruben -- or sorry.  Strike

13     that.

14             I believe you said in your declaration that

15     Mr. Ruben purchased these photographs at your direction;           06:27

16     is that correct?

17     A      Well, that's kind of -- it's -- it's more kind

18     of -- how do I describe it?

19             It's kind of more me doing it than anything.

20     Q      Okay.  Well, can you tell me how these                       06:28

21     purchases occurred, then?

22     A      Basically, I decided to initiate a purchase and

23     worked with a friend -- or through, his account, to do

24     the purchase.

25     Q      So did you actually place these orders for the               06:28

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1   Ali -- it looks like in -- I apologize.  Just for                06:28

2   reference's sake, it looks like there's purchases of two

3   Ali Landry photographs.  And I believes those are the

4   photographs that are at issue in this lawsuit; is that

5   correct?                                                          06:28

6        A    I believe that might be the case, but I can't

7   be sure at this moment.

8        Q    Okay.  Well, we'll come back to that.  But

9   certainly, there were purchases of two photographs,

10  correct?                                                          06:28

11       A    That's what it would appear to be.

12       Q    And did you place the order yourself?

13       A    I believe I did, but I can't recall

14  specifically at this time.

15       Q    And why did you place this order?                       06:29

16       A    I would say just information gathering.

17       Q    Information gathering for what purpose?

18       A    To see how Amazon handles situations.

19       Q    What type of situations?

20       A    How they handle sales of goods that they know          06:29

21  are infringing.

22       Q    And how would Amazon know that these goods were

23  infringing?

24       A    As I seem to recall, but am not certain right

25  at this moment, I believe that they were on notice of            06:29

Page 132

**Barry Rosen - 1/22/2014**

1    them before the purchases took place.                              06:29

2        Q    How were they on notice?

3        A    Because I probably would have sent them a DMCA

4    notice.

5        Q    So do you know when you made these purchases?            06:29

6        A    It appears to be November 11th, 2012.

7        Q    And did you do anything to follow up on this

8    order?

9        A    I can't recall everything, but I believe I

10   probably did.                                                      06:30

11       Q    Do you know -- any idea of what you did to

12   follow up?

13       A    I can't recall.  I'm not certain, but I think

14   it's in my declaration.

15       Q    Okay.                                                     06:30

16       A    And if it is, then I will refer you to my

17   declaration.

18       Q    But you don't recall anything specifically

19   outside of that?

20       A    At this moment, no.                                       06:30

21       Q    Okay.  Have you ever made any other purchases

22   from Amazon for information-gathering purposes related

23   to a DMCA notice that you have sent?

24       A    I can't be certain at this time.

25       Q    Do you believe you have?                                  06:31

Page 133

**Barry Rosen - 1/22/2014**

```
1       A    It's possible, but I can't recall at this time.    06:31

2       Q    And what did this purchase tell you?

3            You said you were --

4            MR. GAFNI:  Objection.

5            MR. SULLIVAN:  Sorry.  I'll strike that.          06:31

6   Withdraw that.

7   BY MR. SULLIVAN:

8       Q    You said you were performing information

9   gathering.  What information did you gather?

10      A    I believe it may be in my declaration, so I       06:31

11  would just refer you to my declaration.

12      Q    Okay.  Do you have any independent recollection

13  right now what information you gathered?

14      A    It seems to me that Amazon is pretty crappy

15  about dealing with stuff that they know is infringing.     06:32

16      Q    What do you mean by that?

17      A    That they fail to stop sales and/or seem to

18  encourage sales, et cetera, et cetera.  But I can't

19  recall the specific details at this time and I would

20  refer you to my declaration.  I believe it might be in     06:32

21  there, but I'm not absolutely certain at this time.

22      Q    So you say they failed to stop sales.  How do

23  they fail to stop sales?

24      A    I can't recall entire details at this time.

25  I -- if it's in my declaration, then I would refer you     06:32
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1   to my declaration.                                              06:32

2       Q    I'm just asking you -- you've said that they

3   failed to stop sales.  I'm just asking you about your

4   statement now, not about what's in the declaration.

5       A    I don't recall all the details and I just refer   06:32

6   you to my declaration.

7       Q    Okay.  You've said also that they seem to

8   encourage sales.  What do you mean by that?

9       A    I believe that may be in my declaration, as

10  well, but I don't recall and I can't answer everything      06:33

11  at this moment, so ...

12      Q    Well, did you draw any conclusions from the

13  information you gathered from this purchase?

14          MR. GAFNI:  Objection.  Asked and answered.

15          THE WITNESS:  I believe I already answered.        06:33

16  BY MR. SULLIVAN:

17      Q    I don't think I've asked you about conclusions,

18  so --

19      A    I believe I may have given you my conclusion

20  already, but ...                                            06:33

21      Q    So your conclusion was that they failed to stop

22  sales and seemed to encourage sales; is that right?

23      A    I believe so.

24      Q    Okay.  So did you ever get the products that

25  you ordered?                                                06:33

Page 135

**Barry Rosen - 1/22/2014**

1      A     I don't recall all the details at this moment        06:33
2   in time.

3      Q     I believe you said that you did receive the
4   products in your declaration.

5            Do you recall that?                                  06:34

6      A     Then I refer you to my declaration.

7      Q     Do you know what you did with those products?

8      A     Not at this time, no.

9      Q     Do you still have them?

10     A     I couldn't tell you at this moment.                   06:34

11     Q     Would you know where to look for them if you
12   did have them?

13     A     Possibly; possibly not.

14     Q     And where would you look for them?

15     A     Any number of places.  Difficult to say.             06:34

16     Q     How about some examples of some places?

17     A     Could be in any number of places.  I don't
18   recall at this moment.

19     Q     Your house?

20     A     Perhaps.                                              06:35

21     Q     Anywhere else?

22     A     Storage.

23     Q     Okay.  Anywhere else?

24     A     Could be with Mr. Steindler.

25     Q     Okay.  Anywhere else?                                 06:35

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Barry Rosen - 1/22/2014**

1     A     I don't recall.                                      06:35

2     Q     And Mr. Steindler is your prior attorney, just

3  for the record, right?

4     A     Yes, he is.

5           I don't recall specifics.  It's entirely            06:35

6  possible they could have ended up with Mr. Steindler.

7     Q     Did you look for those products in response to

8  Amazon's discovery requests?

9     A     I can't recall.  And chances are, if I did have

10 them, I would have given them to Mr. Steindler.              06:36

11    Q     How quickly would you expect the product

12 page -- sorry.  Strike that.

13          You state in your declaration that Amazon has

14 the ability to prevent someone from saving or copying

15 the images displayed on the Amazon Web site.               06:37

16          Do you recall that?

17    A     At this moment, I don't, but if it's in my

18 declaration, I refer you to my declaration.

19    Q     Do you believe that to be true?

20    A     I believe so, yes.                                  06:37

21    Q     And why do you believe that to be true?

22    A     Because I believe there are ways of locking

23 things down, that Amazon doesn't do.  And also, that

24 Amazon, as I recall, also may not also even do anything

25 like water marking or anything else to take steps to       06:37

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Barry Rosen - 1/22/2014

```
 1   BY MR. SULLIVAN:                                        06:39

 2       Q    Actually, you answered a question, which was

 3   ways that Amazon could lock things down.  So I'm asking

 4   a different way.

 5       A    I think the answer might still be the same.    06:39

 6       Q    That you -- you couldn't begin to tell me at

 7   this moment?

 8            MR. GAFNI:  Misstates prior testimony.

 9            THE WITNESS:  At this moment, I'm starting not

10   to even be able to comprehend some of your questions,   06:39

11   so ...

12   BY MR. SULLIVAN:

13       Q    Okay.  Well let me -- let me try to clarify for

14   you.

15            I'm just trying to understand.  When you said  06:39

16   in your declaration that Amazon has the ability to

17   prevent someone from saving or copying the images

18   displayed on the Amazon Web site, you said that you

19   believe that to be true, I'm just trying to understand

20   why you believe that to be true, which you gave some    06:40

21   answers to, that Amazon has some ways of locking down.

22   I'm just trying to figure out what you mean by that.  So

23   if you could explain that a little further, I'd

24   appreciate it.

25       A    I -- I -- I believe Amazon may be able to do   06:40
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Barry Rosen - 1/22/2014**

1   some coding and some other things that would prevent        06:40

2   people from being able to access content as easily as

3   it's currently accessible.

4        Q    And when you say "coding," you mean computer

5   coding, is that --                                          06:40

6        A    I -- yeah.  That's what I would say.

7        Q    Are you aware whether Amazon does anything to

8   prevent access to images currently?

9        A    I couldn't say at this moment, but I believe

10  not.                                                        06:41

11       Q    Why do you believe that they don't?

12       A    I can't recall everything at this moment in

13  time.

14       Q    In your declaration, you also say that you

15  discovered that there's an issue with the size of images    06:41

16  displayed on devices other than computers, such as

17  iPads, iPhones, smart phones, tablets, et cetera.

18            Do you recall that?

19       A    If it's in my declaration, then I refer you to

20  my declaration.                                             06:41

21       Q    Do you believe that statement to be true?

22       A    I do believe that to be true.  Yes.

23       Q    Why do you believe that to be true?

24       A    Because I've seen things.  And I believe

25  they're attached to my declaration, so I refer you back     06:42

Page 140

**Barry Rosen – 1/22/2014**

1   to my declaration.                                          06:42

2        Q    Okay.  But in general, why do you believe that

3   to be true, other than what's in your declaration?

4        A    It's in my declaration.  I refer you to my

5   declaration.                                                06:42

6        Q    So can you explain that statement a little more

7   to me?  You say that there's an issue with the size of

8   images.  What is the issue?

9        A    That I believe it's in my declaration and I

10  refer you back to my declaration.                           06:42

11       Q    Can you take a look at paragraph 32 of your

12  declaration.  That's the paragraph I was referring to on

13  this issue we were identifying.  Let me know if you have

14  anything to add to that, that's not in there.

15            MR. GAFNI:  Objection.  Vague and ambiguous.      06:43

16            Is there a question?

17            MR. SULLIVAN:  Sure.  Is there anything that he

18  wants to add to that.

19            MR. GAFNI:  Vague and ambiguous as to "add to

20  that."                                                      06:43

21            THE WITNESS:  I don't believe there is at this

22  time.

23  BY MR. SULLIVAN:

24       Q    Okay.  Give me two minutes to kind of look

25  through my materials.  And we may be done here in a         06:44

**Barry Rosen - 1/22/2014**

1    couple minutes.                                           06:44

2              So we'll go off the record for just a couple

3    minutes.

4              THE VIDEOGRAPHER:   Off the record.   The time is

5    6:45 p.m.                                                 06:45

6              (Recess taken.)

7              THE VIDEOGRAPHER:   On the record.   The time is

8    6:51 p.m.

9              MR. SULLIVAN:   Counsel, we've been discussing a

10   stipulation.   Mr. Gafni has a proposed stipulation and I   06:51

11   have at least comment on it, but go ahead Mr. Gafni.

12             MR. GAFNI:   So the stipulation that we

13   discussed would be that upon conclusion of this

14   deposition, the court reporter will be relieved of her

15   duties under the -- under the rules;                      06:51

16             Will transmit an original copy of the

17   deposition, along with all exhibits, to plaintiff's

18   counsel, Woolf Gafni and Fowler, at 10850 Wilshire

19   Boulevard, Los Angeles, California 90024;

20             Plaintiff's counsel and plaintiff will then     06:51

21   have 30 days from the date it is sent to review and

22   advise and execute the transcript under penalty of

23   perjury -- or plaintiff will execute under penalty of

24   perjury and advise all other counsel at the time of

25   execution, if there's any changes to the testimony, and   06:52

**Barry Rosen - 1/22/2014**

```
1    STATE OF CALIFORNIA    ) ss:

2    COUNTY OF ORANGE        )

3

4         I, DONNA E. BOULGER, CSR No. 6162, do hereby

5    certify:

6         That the foregoing deposition of BARRY ROSEN was

7    taken before me at the time and place therein set forth,

8    at which time the witness was placed under oath by me;

9         That the testimony of the witness and all

10   objections made at the time of the examination were

11   recorded stenographically by me, were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing is a true record of same.

14        I further certify that I am neither counsel for nor

15   related to any party to said action, nor in any way

16   interested in the outcome thereof.

17        IN WITNESS WHEREOF, I have subscribed my name

18   this 27th day of January 2014.

19

20

21                        _____

22                        DONNA E. BOULGER, CSR No. 6162

23

24

25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**